## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

COLD STAR SALES AND LEASING, INC.,

              Plaintiff,

      v.

TRU ASEPTICS, LLC and JOHN DOES 1-10,

              Defendants.

_____

1:19-cv-14030-NLH-AMD

**OPINION**

**APPEARANCES:**

ADRIAN K. COUSENS
GROSS MCGINLEY LLP
33 SOUTH SEVENTH STREET
ALLENTOWN, PA 18105

     *On behalf of Plaintiff*

RALPH JOSEPH MARRA, JR.
STEPHANIE D. ASHLEY
CALCAGNI & KANEFSKY
1085 RAYMOND BOULEVARD
NEWARK, NJ 07102

     *On behalf of Defendant*

**HILLMAN**, District Judge

    This matter concerns claims by Plaintiff, Cold Star Sales and Leasing, Inc., against Defendant, TRU Aseptics, LLC, for alleged defects in Defendant's processing of Plaintiff's dairy products.[1]  Plaintiff's amended complaint asserts two counts

---

[1] According to Plaintiff's complaint, aseptic processing is a

against Defendant: Count I is for breach of contract, and Count
II is for violations of New Jersey's Consumer Fraud Act,
N.J.S.A. 56:8-1, et seq. ("CFA").[2]

Defendant has moved to dismiss Plaintiff's CFA claim.[3]
Defendant argues that because its contract with Plaintiff
presents a complex, business-to-business transaction where the
goods at issue are not distributed to the public, Plaintiff's
dispute with Defendant does not fall within the protections of
the CFA.  Defendant further argues that Plaintiff's CFA claim is
deficient because it fails to meet the heightened pleading
standard for a viable CFA claim.

Plaintiff has opposed Defendant's motion.  Plaintiff argues
that Defendant's position is based on facts not contained in its

---

technique where "commercially thermally sterilized liquid
products are packaged into previously sterilized containers
under sterile conditions to produce shelf-stable products that
do not need refrigeration."  (Docket No. 14 at 3.)

[2] Defendant removed Plaintiff's case from New Jersey Superior
Court to this Court.  This Court has jurisdiction over this
matter based on the diversity of citizenship of the parties and
an amount in controversy in excess of $75,000, exclusive of
interests and costs, pursuant to 28 U.S.C. § 1332(a).  Plaintiff
is a citizen of New Jersey, and Defendant is a citizen of
Delaware and California.  (See Docket No. 7, Amended Notice of
Removal.)

[3] Previously, Defendant moved to dismiss Plaintiff's original
complaint.  (Docket No. 8.)  In response, Plaintiff filed an
amended complaint, which is the subject of Defendant's instant
motion.  (Docket No. 14.)  Defendant's first motion to dismiss
is therefore moot and will be dismissed as such.

complaint, and Defendant then misconstrues those facts to improperly cast Plaintiff and their dispute as one that falls outside the scope of the CFA.  Plaintiff argues that even though the aseptic process is complex, its business agreement with Defendant was not complex, and the ultimate destination of the processed product is not dispositive of whether the CFA applies. Plaintiff further argues that it has sufficiently pleaded its CFA claim under the proper pleading standard.

### 1.   Standard for a Motion to Dismiss

To determine the sufficiency of a complaint, a court must take three steps: (1) the court must take note of the elements a plaintiff must plead to state a claim; (2) the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth; and (3) when there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.  Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 664, 675, 679 (2009) (alterations, quotations, and other citations omitted)).

A district court, in weighing a motion to dismiss, asks "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim." Twombly, 550 U.S. at 563 n.8 (quoting Scheuer v. Rhoades, 416

3

U.S. 232, 236 (1974)); see also Iqbal, 556 U.S. at 684 ("Our decision in Twombly expounded the pleading standard for 'all civil actions' . . . ."); Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) ("Iqbal . . . provides the final nail in the coffin for the 'no set of facts' standard that applied to federal complaints before Twombly."). "A motion to dismiss should be granted if the plaintiff is unable to plead 'enough facts to state a claim to relief that is plausible on its face.'" Malleus, 641 F.3d at 563 (quoting Twombly, 550 U.S. at 570).

A court in reviewing a Rule 12(b)(6) motion must only consider the facts alleged in the pleadings, the documents attached thereto as exhibits, and matters of judicial notice. S. Cross Overseas Agencies, Inc. v. Kwong Shipping Grp. Ltd., 181 F.3d 410, 426 (3d Cir. 1999). A court may consider, however, "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993). If any other matters outside the pleadings are presented to the court, and the court does not exclude those matters, a Rule 12(b)(6) motion will be treated as a summary judgment motion pursuant to Rule 56. Fed. R. Civ. P. 12(b).

A claim under the CFA must meet the Federal Civil Procedure

4

Rule 9(b) heightened pleading standard.  Frederico v. Home Depot, 507 F.3d 188, 202-03 (3d Cir. 2007); DeFilippo v. Whirlpool Corporation, 2019 WL 4127162, at *6 (D.N.J. 2019) (citing In Re Insulin Pricing Litigation, 2019 WL 643709, at *14 (D.N.J. 2019) (citing Dewey v. Volkswagen, 558 F. Supp. 2d 505, 524 (D.N.J. 2008)).  To satisfy this standard, the plaintiff must "plead the date, time, and place of the alleged fraud, or otherwise inject precision into the allegations by some alternative means," so that the defendant is placed on notice of the precise misconduct with which it is charged.  In re Riddell Concussion Reduction Litig., 77 F. Supp. 3d 422, 433 (D.N.J. 2015).

### 2.  Plaintiff's amended complaint

Plaintiff's amended complaint relates the nature of the parties' businesses, their agreement for Defendant's processing of Plaintiff's dairy products, and what Plaintiff alleges went wrong:

16. Plaintiff Cold Star is a supplier of dairy products including 2% milk; half & half; French vanilla iced coffee; and mocha latte.

17. Defendant TRU Aseptics, LLC holds itself out as a processor of aseptic products for the retail, foodservice and food ingredient markets.

18. Aseptic processing is a technique wherein commercially thermally sterilized liquid products are packaged into previously sterilized containers under sterile conditions to produce shelf-stable products that do not need refrigeration.

5

19. Defendant TRU Aseptics, LLC held itself out as an expert for processing of aseptic dairy products.

20. Defendant TRU Aseptics, LLC held itself out as having the equipment, personnel and expertise to process dairy products including 2% milk; half & half; French vanilla iced coffee; and mocha latte.

21. Representations of the capabilities as set forth in the preceding paragraphs of Defendant, TRU Aseptics, LLC were made by individuals and employees of Defendant, including but limited to Stacel Huels J. Huels, principal, and James E. Hurley, President, CEO and co-founder.

22. Based on the representations made by Defendant TRU Aseptics, Plaintiff agreed to enter into an Agreement for the processing of merchandise, and specifically dairy products including 2% milk; half & half; French vanilla iced coffee; and mocha latte.

23. Accordingly, on or about March 26, 2018 Plaintiff Cold Star executed a Contract prepared by Defendant TRU Aseptics, LLC.

24. The Contract is referred to by Defendant TRU Aseptics, LLC as a Tolling Agreement.

25. Pursuant to the Tolling Agreement, Defendant TRU Aseptics, LLC was to aseptically process 2% milk; half & half; French vanilla iced coffee; and mocha latte.

26. The Tolling Agreement provided for production runs from the date of execution through December 31, 2018.

27. The Tolling Agreement also specifically provided the following: "**Quality** All ingredients are subject to approval by TRU QA team. Finished product will be released no more than 12 days after production due to mandatory QA micro hold."

28. The Tolling Agreement also speci[f]ically provided the following: "**Warranties** - TRU warrantees that all products will be produced in accordance with FDA-filed low acid aseptic process schedules and such products will be produced in accordance with written Client specifications. TRU will be responsible for any produced finished products that are found to be either non-aseptic, or out of written specifications, or in excess of pre-agreed upon yeld loss rates."

29. It is believed and therefore averred that the representations made by Defendant, TRU Aspetics, LLC, its owners, principals and employees were know[]ingly false when made.

30. It is believed and therefore averred that Defendant TRU Aseptics, LLC did not have the requisite knowledge and experti[]se for the processing of aseptic dairy products and their representations to Plaintiff that they did were knowingly false when made.

31. It is believed and averred that Defendant TRU Aseptics, LLC did not have the equipment, personnel and expertise to process dairy products and their representations to Plaintiff that they did were knowingly false when made.

32. Based on the representations made by Defendant TRU Aseptics, Plaintiff agreed to enter into an Agreement for the processing of merchandise, and specifically dairy products including 2% milk; half & half; French vanilla iced coffee; and mocha latte.

33. The process that Defendant TRU Aseptics, LLC used to produce dairy products for the Plaintiff was defective and resulted in unusable, unstable dairy products.

34. Plaintiff commenced ordering of aseptic dairy products from Defendant TRU Aseptics, LLC in April 2018.

35. Defendant TRU Aspetic, LLC produced approximately 18,000 bags of product that [were] supposed to be FDA quality and customer specified aseptic dairy products.

36. By late April or early May 2018 consumers of the aseptic dairy products produced by Defendant identified that the product was defective.

37. The scope of the defects in the products are not yet completely known, but consumers identified widespread scaling, which renders the product non-compliant with the Tolling Agreement and other industry standards.

38. Additionally, customers identified widespread mold in the products produced by Defendant, which renders the product non-compliant with the Tolling Agreement and other industry standards was identified.

39. Additionally, customers identified widespread black mold

in the products produced by Defendant, which renders the product non-compliant with the Tolling Agreement and other industry standards was identified.

40. Said products were defective and had to be returned.

41. Approximately half of the product produced by the Defendant was returned by consumers because it was defective.

42. Defendant, by and through its principals, agents, and/or employees requested that the defective product be returned to the Wisconsin processing plant.

43. Pursuant to that request, product was shipped to Defendant.

44. Defendant, by and through its principals, agents, and/or employees admitted that the product was defective.

45. Defendant, by and through its principals, agents, and/or employees promised that the Plaintiff would be reimbursed for the damages it had incurred as a result of the actions of TRU Aseptics, LLC.

46. Plaintiff has requested internal and external Quality Assurance (QA) reports for the processing performed by Defendant.

47. No such QA reports have ever been provided.

48. It is believed and therefore averred that Defendant processed a large amount of product which was never released or shipped to Plaintiff nor its customers.

49. Plaintiff was compelled to purchase replacement aseptic dairy products from a third party to replace defective products produced by Defendant.

50. The cost of the replacement aseptic dairy products purchased exceeded the original cost of the products contaminated by the Defendant.

51. As a result of the shipment of defective aseptic dairy products from Defendant TRU Aseptics, LLC, many of Plaintiff's customers cancelled orders and contracts with Plaintiff.

52. As a result of the shipment of defective aseptic dairy products from Defendant TRU Aseptics, LLC, Plaintiff lost a large number of customers.

53. Defendant knew or should have known said product was defective.

54. Defendant admitted knowledge that their merchandise was defective.

55. Demand was made to Defendant for reimbursement of damages, including replacement product costs as well as lost business and revenue.

56. Despite an initial promise to honor its obligations under the Tolling Agreement, Defendant has refused to pay for the damages it caused to Plaintiff.

57. Damages due to product loss and related expenses related to the actions of the Defendant are conservatively estimated to be at least $400,000.

58. Damages due to loss of customers and future business due to the actions of the Defendant are conservatively estimated to be at least $600,000.

(Docket No. 14 at 3-7.)

Plaintiff's CFA claim alleges:

70. Defendant has engaged in fraudulent and/or unconscionable commercial practices . . .

71. Each unconscionable commercial practice constitutes a separate violation under the Consumer Fraud Act, N.J.S.A. 56:8-2.

72. Plaintiff has sustained an ascertainable loss as a result of the Defendant's fraudulent and/or unconscionable commercial practices.

(Docket No. 14 at 8-9.)

**3. New Jersey's Consumer Fraud Act**

New Jersey's Consumer Fraud Act, N.J.S.A. 56:8-1 to -210, is a powerful "legislative broadside against unsavory commercial practices" in the marketplace. All the Way Towing, LLC v. Bucks County International, Inc., 200 A.3d 398, 400 (N.J. 2019)

9

(citation omitted).  When initially enacted, the CFA addressed
the elimination of sharp practices and dealings in the marketing
of merchandise.  Id. (citation omitted).  "Continuously expanded
by the Legislature over the years, the CFA's reach now extends
beyond 'fast-talking and deceptive merchant[s]' to protect the
public even when a merchant acts in good faith." Id. (citations
omitted).  In light of the CFA's remedial purpose, courts
liberally enforce the CFA to fulfill its objective to protect
consumers from prohibited unconscionable acts by sellers.  Id.
(citation omitted).

> The CFA provides in relevant part:
>
> The act, use or employment by any person of any
> unconscionable commercial practice, deception, fraud, false
> pretense, false promise, misrepresentation, or the knowing,
> concealment, suppression, or omission of any material fact
> with intent that others rely upon such concealment,
> suppression or omission, in connection with the sale or
> advertisement of any merchandise or real estate, or with
> the subsequent performance of such person as aforesaid,
> whether or not any person has in fact been misled, deceived
> or damaged thereby, is declared to be an unlawful practice
> . . . .

N.J.S.A. 56:8-2.

> The term "merchandise" shall include any objects, wares,
> goods, commodities, services or anything offered, directly
> or indirectly to the public for sale[.]

N.J.S.A. 56:8-1(c).

> Any person who suffers any ascertainable loss of moneys or
> property, real or personal, as a result of the use or
> employment by another person of any method, act, or
> practice declared unlawful under this act or the act hereby
> amended and supplemented may bring an action or assert a

counterclaim therefor in any court of competent jurisdiction. In any action under this section the court shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest. In all actions under this section, including those brought by the Attorney General, the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit.

N.J.S.A. 56:8-19.

"[I]t is well established that the CFA is applicable to commercial transactions." All the Way Towing, 200 A.2d at 405-06 (citing Coastal Grp., Inc. v. Dryvit Sys., Inc., 274 N.J. Super. 171, 175, 179-80, 643 A.2d 649 (App. Div. 1994) (holding that trial court erred when it dismissed CFA claim on the ground that "one commercial entity may not recover in tort for economic losses allegedly caused by a product purchased from another commercial entity"); Hundred E. Credit Corp. v. Eric Schuster Corp., 212 N.J. Super. 350, 355, 515 A.2d 246 (App. Div. 1986) (same); D'Ercole Sales, 206 N.J. Super. at 23, 501 A.2d 990 (same); N.J.S.A. 56:8-1(d) (the definition of "person" includes business entities such as a "partnership, corporation, company . . . , business entity or association").

Whether the sale of "merchandise" in a business-to-business transaction falls within the scope of the CFA depends on the nature of the transaction. Id. at 408. To make this determination, a court should consider four factors: (1) the complexity of the transaction, taking into account any

11

negotiation, bidding, or request for proposals process;
(2) the identity and sophistication of the parties, which
includes whether the parties received legal or expert assistance
in the development or execution of the transaction; (3) the
nature of the relationship between the parties and whether there
was any relevant underlying understanding or prior transactions
between the parties; and . . .; (4) the public availability of
the subject merchandise.  Id. (with regard to the fourth factor,
explaining that in the case before the court, "[s]imply because
identically customized tow trucks are not typically sold to the
'public at large' does not mean the trucks are not offered 'to
the public for sale.' . . . [I]t is irrelevant that the 'public
at large' does not purchase International trucks onto which a
Dynamic 801 tow unit is installed.  The relevant point is that a
member of the public so inclined could purchase an operational
tow truck consisting of a Dynamic 801 tow body installed onto an
International chassis.  It is consistent with the remedial
purposes of the CFA to protect consumers regardless of the
popularity of the product or service sold or advertised").

> ### 4.  Analysis

As noted above, Defendant argues that its agreement with
Plaintiff involved a complex process, they are sophisticated
parties, and the "merchandise" Defendant processed for Plaintiff
- five-liter bags of dairy product - was intended for resale to

the food industry and not the public.  Defendant therefore
argues that its business with Plaintiff is not covered by the
CFA under the factors set forth in All the Way Towing.

Plaintiff counters that their agreement was simple and
entered into without attorneys or any other professionals
involved, and that regardless of whether the particular
merchandise Defendant prepared for Plaintiff was intended for
the food industry, the test is not where the merchandise is
going, but rather whether it could be purchased by the public.
Plaintiff argues that its claims against Defendant are properly
brought under the CFA, and that Defendant's arguments exceed the
bounds of their Rule 12(b)(6) motion because Defendant focuses
on misconstrued facts that are not in Plaintiff's complaint.

The Court finds that when focusing solely on the
allegations in the complaint, which the Court must do when
considering a motion to dismiss under Rule 12(b)(6), Plaintiff
has satisfied the proper pleading standard for its CFA claim to
proceed past the motion to dismiss stage.

To establish a prima facie case under the CFA, "a plaintiff
must allege (1) unlawful conduct by the defendant, (2) an
ascertainable loss by plaintiff; and (3) a causal connection
between the defendant's unlawful practice and the plaintiff's
ascertainable loss." DeFillippo v. Whirlpool Corporation, 2019
WL 4127162, at *5 (D.N.J. 2019) (quoting MZL Capital Holdings,

Inc. v. TD Bank, N.A., 734 F. App'x 101, 104 (3d Cir. 2018)
(citing Zaman v. Felton, 219 N.J. 199, 98 A.3d 503, 516 (N.J.
2014)) (other citation omitted).

Unlawful conduct falls into three general categories:
affirmative acts, knowing omissions,[4] and violation of
regulations. Chaudhri v. Lumileds LLC, 2018 WL 6322623, at *6
(D.N.J. 2018) (citing N.J.S.A. 56:8-2, 56:8-4). An affirmative
misrepresentation under the CFA is "one which is material to the
transaction and which is a statement of fact, found to be false,
made to induce the buyer to make the purchase." Id. (citation
omitted). "Unlike common law fraud, the CFA does not require
proof of reliance." Id. (quoting Marcus v. BMW of N. Am., LLC,
687 F.3d 583, 606 (3d Cir. 2012)). Additionally, "[w]hen the
alleged consumer-fraud violation consists of an affirmative act,
intent is not an essential element and the plaintiff need not
prove that the defendant intended to commit an unlawful act."
Cox v. Sears Roebuck & Co., 647 A.2d 454, 462 (N.J. 1994).

---

[4] A plaintiff asserting a claim based on an omission must
demonstrate that the defendant "'(1) knowingly concealed (2) a
material fact (3) with the intention that plaintiff rely upon
the concealment.'" Galo Coba, v. Ford Motor Company, 932 F.3d
114, 124 (3d Cir. 2019) (quoting Judge v. Blackfin Yacht Corp.,
815 A.2d 537, 541 (N.J. Super. Ct. App. Div. 2003)) (citing
N.J.S.A. 56:8-2). "Where a plaintiff's theory is based on a
knowing omission, the plaintiff must show that the defendant
acted with knowledge, and intent is an essential element of the
fraud." Cameron v. South Jersey Pubs, Inc., 213 A.3d 967, 984-
95 (N.J. Super. Ct. Appl Div. 2019) (citations omitted).

In this case, Plaintiff alleges conduct by Defendant that
constitutes an affirmative act.[5]  Plaintiff claims that Defendant
affirmatively represented that it had the knowledge and
expertise for processing aseptic dairy products, but Defendant
did not.  Plaintiff claims this misrepresentation caused it to
enter into an agreement with Defendant, which resulted in the
loss of at least $1 million, which includes the financial value
of the defective product, its lost customers, and future
business.

These allegations, when accepted as true, state a valid
prima facie case under the CFA.  Plaintiff has alleged an
"unconscionable commercial practice, deception, [or] fraud"
(Defendant misrepresented that it had the knowledge and
expertise for processing aseptic dairy products), perpetrated by
a "person" (Defendant), "in connection with the sale or
advertisement of any merchandise" (the processing of aseptic
dairy products),[6] which caused an "ascertainable loss"

---

[5] Plaintiff's CFA count also lists ten additional "unconscionable
commercial practices" allegedly committed by Defendant.  (Docket
No. 14 at 8-9.)  Whether those allegations support additional
CFA violations is not an issue specifically before the Court.
The Court also does not opine on whether Plaintiff's allegations
present a "knowing omission" claim.

[6] As set forth above, the term "merchandise" includes "services"
offered "directly or indirectly to the public for sale."
N.J.S.A. 56:8-1(c).  Defendant argues that the end result of its
aseptic processing - 5-liter bags of dairy product destined for
food wholesalers - is not offered directly to the public for

(replacement of damaged product, lost profits, lost customers, and lost future business earnings).

The New Jersey Supreme Court has observed that "a more nuanced assessment can be required to determine whether a transaction, good, or service is of the type offered to the public, bringing it within the CFA." All the Way Towing, 200 A.3d at 407.  That is exactly the situation here.  Defendant has construed its business relationship with Plaintiff to be the kind of commercial situation courts have held are not covered by CFA, but nothing on the face of Plaintiff's complaint or the parties' agreement shows that Plaintiff's CFA claim is not plausible as pleaded.[7]  Going forward, it will be Plaintiff's

---

sale.  That is not the proper focus of the nature of the "merchandise" at issue.  Rather, it is Defendant's aseptic processing services that is the "merchandise" Plaintiff alleges was offered "directly or indirectly to the public," which Plaintiff alleges constitutes unlawful conduct by Defendant.

[7] Defendant argues that by failing to specify the exact nature of the aseptic product Defendant processed for Plaintiff in Plaintiff's amended complaint, and by not attaching the parties' agreement to its amended complaint, Plaintiff has attempted to hide that the subject "merchandise" is not covered by the CFA. It is true Plaintiff did not attach the agreement to its amended complaint or state that Plaintiff's dairy products were to be processed into "Rapak 5L bag, IDC fitment, corrugated box, glue or tape sealed." (Agreement, Docket No. 16-2 at 6, exhibit to Defendant's motion to dismiss.)  Whatever Plaintiff's intention regarding these omissions may have been, it is not relevant to the Court's assessment of what averments are included in Plaintiff's complaint.  Moreover, as acknowledged by Plaintiff in its opposition brief, its failure to attach the agreement to the amended complaint is effectively meaningless because the Court may still consider it when resolving Defendant's motion to

burden to prove its CFA claim against Defendant, which will necessarily include showing that the parties' business relationship falls under the CFA's protections, but at this stage in the case, Plaintiff's CFA count may proceed.

Consequently, for the foregoing reasons, Defendant's motion to dismiss Plaintiff's CFA count in its amended complaint must be denied.  An appropriate Order will be entered.


Date: April 17, 2020                    s/ Noel L. Hillman
At Camden, New Jersey          NOEL L. HILLMAN, U.S.D.J.

---

dismiss.  Pension Benefit, 998 F.2d at 1196.  The Court reiterates that Defendant's view of the parties' business relationship cannot be determined at the motion to dismiss stage because its view is not supported by the face of Plaintiff's complaint.  Defendant's view may ultimately prove to be correct, but that determination must be made through a different motion or at a later stage in this case.